# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

—————————

No. 98-10110

—————————

## UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

## ROBERTO ROBLES, ARTURO HERRERA, and ARTURO GURRUSQUIETTA,

Defendants-Appellants.

—————————

Appeals from the United States District Court
for the Northern District of Texas
(3:97-CR-158-16-P)

—————————

August 26, 1999

Before JOLLY and SMITH, Circuit Judges
and VANCE, District Judge[*]

JERRY E. SMITH, Circuit Judge:[**]

Roberto Robles, Arturo Herrera, and Arturo Gurrusquietta were convicted under 21 U.S.C. § 846 and 18 U.S.C. § 834(b) of marihuana distribution and using a communications device to facilitate a drug crime. Robles and Herrera were convicted under 18 U.S.C. § 1956 for money laundering. We affirm except for Gurrusquietta's sentence, which we remand for resentencing.

I.
A.

For some time, government agents had been gathering evidence about a substantial conspiracy in the Dallas area to distribute marihuana imported from Mexico. Through the testimony of co-conspirators and law enforcement agents, and based on physical evidence obtained during government searches and surveillance, the government established that the conspiracy was run by the de la Torre family.

1.

---

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

[**] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Miguel de la Torre, an indicted co-conspirator who pleaded guilty before trial, testified that he headed a marihuana trafficking organization based in Dallas. Someone in Dallas would send money to a runner in Mexico, who would arrange to buy the marihuana and package it for shipment over the border. Once the marihuana reached Laredo, Texas, one of three men in de la Torre's organization would receive the marihuana and transfer it to Irving, Texas, where it was stored at de la Torre's stash house.

Miguel paid the runner in Mexico to arrange the purchase and would pay the person who arranged the border crossing and would pay his three agents in Laredo to transport the marihuana from the border to Dallas. He usually used one of three companies, Western Union, Tex-Mex Transfer, and Alas International, to pay the members of his organization. At trial, he identified a number of receipts showing transfers of money for purposes of buying and distributing marihuana.

When he had difficulty receiving his marihuana from Mexico, Miguel testified that he would purchase marihuana from other sources. In particular, he identified appellant Gurrusquietta and his brother Juan as two of his backup suppliers. He testified that in March 1997, he made purchases of both 30 pounds and 100 pounds of marihuana from Arturo Gurrusquietta. The third purchase, consisting of 110 pounds, occurred in April 1997.

In the course of these transactions, Miguel had numerous telephone conversations with both Gurrusquietta brothers. The government recorded a number of these conversations and played them at trial. The taped conversations established that Arturo and Miguel discussed amounts of marihuana available for purchase, the return of bad marihuana, packaging and shipment problems for the marihuana, the price, and the payment of money for the marihuana.

Miguel also testified that Robles worked for his organization. Identifying Robles in the courtroom, Miguel explained that Robles collected money and weighed marihuana. Robles began working for the organization in April 1997, after his brother was arrested.

Robles's duties included repackaging large bundles of marihuana into one pound units for resale. He also collected money owed to Miguel for marihuana, sometimes on his own and sometimes with Miguel. Again, the government provided recorded telephone conversations between Miguel and Robles, establishing that Miguel gave instructions to Robles about money he needed to collect and marihuana that needed to be packaged.

Miguel also testified about the role Herrera played in the drug organization. Concerned about police surveillance, Miguel contacted Herrera and asked him to see whether the police were investigating him. He told Herrera that he was dealing marihuana and that he thought he was being followed.

Herrera told Miguel that he knew of narcotics officers he could pay to protect Miguel. He suggested that Miguel pay off four narcotics officers at $3,000 a month. After speaking with Herrera, Miguel testified that he did pay Herrera about $3,000.

Again, the government offered recorded telephone conversations that confirm Miguel's testimony. In one conversation, Miguel gave his address, date of birth, and full name to Herrera so that Herrera could find out whether Miguel was the target of surveillance. In another conversation, Herrera told Miguel the results of his search and informed Miguel that people Miguel did business with were under investigation, and that one of these people was informing the police. In other conversations, Herrera continued to assure Miguel that if he paid for protection, he would avoid arrest.

Carmela de la Torre also testified, corroborating much of Miguel's testimony. She stated that she was familiar with many of the participants in the organization, and she identified Herrera in the courtroom. When listening to taped telephone conversations,

Carmela identified Herrera's voice and was heard discussing terms of their police protection payments with him. She also testified that Miguel would tell her about how Robles worked for the organization by collecting money and packaging marihuana.[1]

2.

The government presented evidence describing its surveillance of the de la Torre organization. In particular, DEA agent Joe Rodriguez explained how he followed a shipment of marihuana from the border to the de la Torre "stash house" in Angelina, Texas. After a lawful search, the agents arrested Aguirre (Carmela's boyfriend), Miguel de la Torre, and another co-conspirator at the Angelina location.

To link Arturo Gurrusquietta to the de la Torre organization, the government presented Agent John McSwain, who testified that agents found out, through their wiretap, that a drug transaction would take place on April 8 at the de la Torre residence. They put the house under surveillance and observed the arrival and then departure of a black Mustang. They followed the Mustang to another house and observed a man later identified as Arturo Gurrusquietta remove a gym bag from the Mustang and place it on the porch. A few minutes later, a silver LeBaron driven by a man later identified as Juan Gurrusquietta arrived. Taking the gym bag and a cellular telephone, Arturo Gurrusquietta got in the LeBaron and drove away.

McSwain and other FBI agents followed the LeBaron on a highway. They contacted two Texas Department of Public Safety officers and asked them to conduct a traffic stop. They informed the officers of their observations and that they had reason to believe narcotics were in the vehicle. The officers conducted a traffic stop based on the LeBaron's abrupt lane change, then obtained consent to search the vehicle.

The FBI agents participated in the search and found the gym bag, three cellular telephones, and tax returns in the car. Inside the gym bag, the searchers found $43,000 bundled in rubber bands and wrapped in aluminum foil and a loaded handgun. McSwain testified that the packaging of the money was typical for drug money and that the cell phones found the vehicle matched numbers called by members of the de la Torre organization. Additionally, the search turned up tax returns for both Gurrusquietta's. Arturo Gurrusquietta showed a taxable income of $14,192. This tax return would later prove significant in Arturo Gurrusquietta's money laundering charge.[2]

---

[1] The court overruled Robles's objection to this testimony as inadmissible hearsay.

[2] Arturo Gurrusquietta moved to exclude the evidence obtained during this search as unsupported by probable cause. Without holding a hearing, the court reviewed the search *in camera* and denied the motion.

3

Officer Joseph Emmett testified that he knew Herrera because they worked at the same school. Herrera asked him to check for the names of people for outstanding warrants. Despite being turned down, Herrera continued to ask Emmett to check on names.

Much of the government's case depended on wiretap and physical evidence. Agent Arturo Canedo, fluent in Spanish, testified that he listened to all the tapes made in the wiretaps and translated them into English. He described how the agents would try to identify voices based on the conversations and the numbers from which the calls originated. Other agents testified that they seized drug papers, money transfer receipts, scales, and other drug paraphernalia during warrant searches of seven different locations. A number of witnesses testified as custodians of telephone, pen register, wire transfer, shipping, and pager records.[3]

### B.

Thirty-one defendants were indicted for conspiracy to import and distribute marihuana in violation of 21 U.S.C. § 846. None of the appellants was charged in the second count. Subsequently, the indictment was twice superseded; the last superseding indictment charged only twenty-one defendants and maintained basic conspiracy charges against all three appellants. Additionally, Robles and Gurrusquietta were charged with one count, and Herrera was charged with three counts, of using a communication device to facilitate a drug-trafficking crime in violation of 18 U.S.C. § 834(b).

Herrera was also charged with one count of accessory after the fact to possession with intent to distribute marihuana in violation of 18 U.S.C. § 3. Herrera was charged with one count, and Gurrusquietta was charged with two counts, of money laundering in violation of 18 U.S.C. § 1956. Gurrusquietta was also

charged with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h).

A jury found all three appellants guilty of the drug conspiracy charges. Robles and Gurrusquietta were also convicted of one count, and Herrera was convicted of three counts, of using a communication device to facilitate drug trafficking. Herrera and Gurrusquietta were convicted on their money laundering counts, and Gurrusquietta was convicted on his conspiracy to commit money laundering count. Herrera, however, was acquitted of his accessory to possession of marihuana count.

### II.

Robles and Herrera (but not Gurrusquietta) attack the sufficiency of the evidence for their drug conspiracy convictions; Robles and Herrera challenge the sufficiency of the evidence for their use of a communication device convictions. Herrera challenges the sufficiency of the evidence for his money laundering conviction, and Gurrusquietta makes a similar challenge to his *conspiracy* to launder money conviction (but not his substantive money laundering convictions).

Appellants also allege that several errors were made at trial. Robles makes several evidentiary challenges, arguing that Carmela's testimony relating Miguel's description of Robles's role was inadmissible hearsay and that (2) pen register and wiretap records did not qualify for the business records exception to the hearsay rule. He also objects that the prosecutor's statement of personal belief in Robles's guilt prejudiced his trial.

Herrera attacks the district court's refusal to sever his trial from the co-defendants'. He also alleges error occurred when the court refused to allow him to call certain witnesses and to cross-examine certain government witnesses. Relatedly, Herrera attacks his trial counsel for allegedly rendering ineffective assistance by failing to move for a judgment of acquittal at the close of evidence. Gurrusquietta argues that the court reversibly erred in failing to suppress evidence obtained during the April 8, 1997, traffic stop, because

---

[3] Robles challenges the admission of this evidence under the business records exception to the hearsay rule, arguing that the government laid insufficient foundation.

the warrantless search was not supported by probable cause.

Robles and Gurrusquietta challenge their sentences. Robles argues that the court clearly erred when it enhanced his sentence for use of a firearm and attributed 1,000 pounds of marihuana to him. Gurrusquietta points out that there is no evidence that he was involved in the distribution of the 1,000 kilograms attributed to him.

We affirm the sufficiency of the evidence for all of the convictions and affirm all the trial rulings. We dismiss, without prejudice, Herrera's claim of ineffective assistance of counsel. We affirm Robles's sentencing enhancements, but we reverse and remand the calculation of the amounts of marihuana attributed to Gurrusquietta.

A.

When reviewing a challenge to the sufficiency of the evidence, we review the evidence and all inferences reasonably drawn from it in the light most favorable to the verdict. *Glasser v. United States*, 315 U.S. 60 (1942). The conviction must be affirmed if any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307 (1979).[4]

1.

To convict of conspiracy under § 846, the government must prove beyond a reasonable doubt (1) the existence of an agreement between two or more persons to violate a federal drug statute; (2) that each conspirator knew of the conspiracy; (3) that each conspirator intended to join the conspiracy; and (4) that each conspirator did participate in the conspiracy. *United States v. Ramirez*, 145 F.3d 345, 350 (5th Cir. 1998). The government must prove more than knowledge of a conspiracy or association with conspirators. *United States v. Grassi*, 616 F.2d 1295, 1301 (5th Cir. 1980). When combined with other circumstantial evidence, knowledge and association may be used to prove an agreement to join a conspiracy. *Id.* at 1301-02. Additionally, the government is not required to prove knowledge of all details of the conspiracy or each of its members, provided that the defendant has knowledge of the essentials of the conspiracy. *United States v. Alvarez*, 625 F.2d 1196, 1198 (5th Cir. 1980). An agreement may be inferred from a "concert of action," voluntary participation may be inferred from a "collocation of circumstances," and knowledge may be inferred from "surrounding circumstances." *Espinoza-Seanez,* 862 F.2d 526, 537 (5th Cir. 1988).

To establish a violation of using a communication device to facilitate a drug felony, the government must prove: (1) knowing and intentional (2) use of a telephone

___

[4] Robles also invites us to review for *factual* insufficiency under *Tibbs v. Florida*, 457 U.S. 31, 37 (1982). Under a review for *factual* insufficiency, we may reverse if we find the jury's verdict against the great weight of the evidence. In this case, we "sit[] as a 'thirteenth juror' and disagree[] with the jury's resolution of the conflicting testimony." *Id.* at 42. We may reverse for a new trial if the government is free to seek another conviction and the defendant may again seek acquittal. In *Tibbs*, the Court reviewed a state court proceeding in which the courts had unambiguous authority to grant a new trial for verdicts going against the great weight of the evidence.

The authority for federal courts to reverse for *factual* insufficiency, however, is based on FED. R. (continued...)

___

(...continued)
CRIM. P. 33, which permits a district court to set aside a conviction that is against the weight of the evidence. *See United States v. Robertson*, 110 F.3d 1113, 1118 (5th Cir. 1997). We review such determinations only for abuse of discretion. *See United States v. Lopez*, 803 F.2d 969, 977 (9th Cir. 1986).

Such error, however, must be preserved by a motion for a new trial. Because we find the evidence supporting Robles's conviction both legally and *factually* sufficient, we do not have to consider whether he sufficiently preserved error to be entitled to this level of review.

(3) to facilitate a drug felony. *United States v. Dixon*, 132 F.3d 192, 200 (5th Cir. 1997). Because the evidence supporting the sufficiency of the drug conspiracy convictions is almost identical to the evidence supporting these communication device convictions, we will examine these sufficiency challenges together.

a.

Robles asserts that the evidence only supports his mere "presence and association" with Miguel de la Torre, but not that he agreed to join Miguel's drug trafficking conspiracy. Instead, he claims that he and Miguel spent time together socially for the purpose of dating women. Even though Miguel testified that Robles "worked for him," he also stated that Robles would often wait outside when Miguel went to collect money. Therefore, Robles argues that he never agreed with Miguel that he would work for him or with the organization for the overall objective of distributing and selling marihuana.

Robles's argument is unpersuasive. Miguel testified that Robles would collect money and repackage marihuana on behalf of the organization. Miguel's testimony is corroborated by recorded conversations between Robles and Miguel discussing problems with repackaging, collecting money, and even the problems of locating a new stash house. Carmela's testimony also corroborated Miguel's testimony by confirming that Robles worked for Miguel by collecting money for the organization. Robles has offered no basis to disbelieve Miguel's and Carmela's testimony as "incredible," and basic credibility judgments are left to the jury. Even though Robles's role in the conspiracy is relatively minor, he can be held liable for it once it is shown he has voluntarily agreed to participate. *United States v. Gonzales*, 866 F.2d 781, 788 (5th Cir. 1989).

For similar reasons, Robles cannot claim that he did not know that he was using a communication device to facilitate a drug crime. Numerous recorded telephone conversations showed that he spoke to Miguel and Carmela about matters at the heart of the conspiracy, including collecting money, repackaging the marihuana for sale, and finding an adequate stash house. The evidence is sufficient whether we review for legal or factual sufficiency. Therefore, we affirm Robles's conviction of conspiring to distribute in violation of § 846 and of using a communication device to facilitate a drug crime in violation of § 834(b).

b.

(i)

Because Herrera failed to move for acquittal at the close of evidence, he did not preserve his objection to sufficiency of the evidence, so we review only for plain error. We may find plain error "only when the appellant shows that (1) there is an error, (2) the error is plain, and (3) the error affects her substantial rights." *United States v. Ravitch,* 128 F.3d 865, 869 (5th Cir. 1997) (citing *United States v. Olano*, 507 U.S. 725, 732 (1993). Even if we find such an error, however, we will not "exercise [our] discretion to correct such error[] unless the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.*

"Error is defined as a deviation from a legal rule in the absence of a valid waiver." *United States v. Calverley,* 37 F.3d 160, 162 (5th Cir. 1994) (en banc). "Plain is synonymous with 'clear' or 'obvious' and 'at a minimum' contemplates an error which was 'clear under current law' at the time of the trial." *Id.* Finally, "affecting substantial rights" is understood to mean that the error "must affect the outcome of the proceeding." *Id.* at 164.

(ii)

Essentially, Herrera claims that he acted only to dupe the de la Torre organization into paying him money for police protection. There is no evidence that Herrera transported, sold, distributed, or bought any marihuana. The only evidence of his involvement consists of taped telephone conversations in which Herrera told Miguel that the police had marked an "X" on the location of his house and in which he asked for money to bribe police officers.

Because there is no evidence that Herrera actually *acted* to gain police protection for the de la Torres, he argues that there is no evidence he intended to join the drug conspiracy by paying off police officers or that he actually paid any bribes that would constitute participation in the conspiracy. There is no evidence that Herrera was even in the position to pay bribes to police officers.

Herrera does not contest the evidence supporting the first element for a conspiracy conviction: There is overwhelming evidence that a conspiracy to distribute marihuana existed. Instead, he focuses his assaults on the last three elements: *knowledge* of the conspiracy, *intention* to join the conspiracy, and *participation* in the conspiracy. He argues that the court committed plain error in regard to each of these latter three elements.

(a)

Herrera asserts that his minimal role in the conspiracy is akin to that of a passive "lookout," and he points us to cases in which we found insufficient evidence to support conspiracy convictions for alleged "lookouts." For instance, we have refused to infer participation in a conspiracy by a defendant who joined conspirators at a restaurant and "seemed very watchful of the comings and goings in the restaurant, turning his head from left to right." *United States v. Jackson*, 700 F.2d 163, 184 (5th Cir. 1983). "Without evidence that he knew the nature or purpose of the meeting or even that a large amount of money was present," we reversed the conviction. *Id.* at 185.

Herrera's situation is not exactly analogous. While there is no evidence that he knew the details or extent of the de la Torre conspiracy, there is evidence that he knew enough about their activities to know they would want police protection. Therefore, unlike the situation in the "lookout cases" cited by Herrera, there is no question that he knew the nature and purpose of the de la Torre conspiracy and that there was sufficient evidence to support the "knowledge" element of his conspiracy conviction. By asking for (over the telephone) and accepting money to protect that conspiracy, Herrera can be inferred to have known he was taking money from an illegal drug conspiracy.

(b)

Miguel and Carmela testified that they believed Herrera was providing them with protection from the police through bribes. Additionally, the government offered the testimony of a Dallas police officer who recounted Herrera's efforts to get him to search for names of people under investigation. The jury reasonably could have inferred that Herrera did intend to pay bribes or otherwise provide protection to the de la Torre organization by finding out whether members of the organization were targets of police investigations. Therefore, under plain error review, the government has provided sufficient evidence to support the "intention" element of a conspiracy conviction.

(c)

Herrera has a better argument when he asserts that there is no evidence of some further act by him (i.e., paying bribes) to satisfy the "participation" element of a conspiracy conviction. While the evidence establishes that Herrera asked for (over the telephone) and received money that he *said* would be used to bribe officers, he maintains that the utter lack of evidence that he *acted* to do anything means that the "participation" element is not supportable.

Perhaps recognizing the force of this argument, the government claims that merely accepting the money and promising to provide police protection gave the conspirators a

**7**

"sense of safety." By aiding the conspiracy in this way, the government claims, Herrera "participated" in a way that satisfies the fourth element of the conspiracy statute.

Irrespective of the validity of this argument, and even though there was not substantial evidence regarding Herrera's bribery attempts, there was ample evidence from which the jury could infer that he actually had tried to find out whether Miguel was under investigation. Officer Joseph Emmett testified that Herrera attempted to enlist his aid in identifying police surveillance targets. Emmett explained that Herrera would ask him a couple times a week to check police records for certain names and that Herrera would provide Emmett the names and birthdates of certain individuals. Emmett further testified that despite his repeated refusals, Herrera persisted in asking him to do such checks through the spring of 1997.

We cannot say the jury committed plain error when it construed these actions as "participation" for purposes of the conspiracy charge. We therefore affirm the sufficiency of evidence for Herrera's drug conspiracy and communication device convictions,[5] based on his "participation" in trying to find out information about his co-conspirators. We find no plain error and affirm Herrera's conviction for conspiracy and communication device violations.

### 2.
#### a.

To convict of money laundering under § 1956, the government must prove that the defendant (1) knowingly conducted a financial transaction that affects interstate or foreign commerce; (2) which involved the proceeds of an unlawful activity; and (3) with the intent to promote or further that unlawful activity, or

---

[5] Almost all the evidence against Herrera is based on his recorded conversations with Miguel de la Torre. His detailed telephone conversations with Miguel about checking his name and social security number for possible police investigations suffices to support his use of communication device to facilitate a drug crime.

(4) with the intent to conceal the nature, location, source, ownership or control of the proceeds. *United States v. Garza*, 118 F.3d 278, 284 (5th Cir. 1997). The government argues that Herrera's actions meet these requirements. First, the recorded conversations support the inference that Herrera accepted $3,000 from the de la Torre organization, thereby fulfilling the "financial transaction" element. Second, the conversations revealed that Herrera knew about the de la Torre organization's illegal drug trafficking activities, and the jury could have inferred from these conversations that Herrera realized any money he received would be the proceeds from those illegal activities. Third, Herrera's conversations also revealed his promise to use the $3,000 to bribe Dallas police officers, thereby fulfilling the "intention to promote" element.

The government also reiterates that Herrera did not move for a judgment of acquittal at the close of evidence and failed to preserve his objection to the sufficiency of the evidence for his money laundering conviction. Therefore, we review for plain error and will reverse only if it would be a manifest miscarriage of justice to allow the verdict to stand. *United States v. Bailey*, 111 F.3d 1229, 1235 (5th Cir. 1997).

#### (i)

Herrera claims that the $3,000 he received from the de la Torre organization does not constitute a "financial transaction" within the meaning of § 1956. He points out that the statute defines a "financial transaction" as "a *transaction* which in any way or degree affects interstate or foreign commerce . . . ." § 1956(c)(4)(A). The statute then defines a "transaction" as a "purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition" or some action involving a financial institution or its facilities. § 1956(c)(3). Therefore, as we have pointed out, a "financial transaction" must at least be a "transaction" as defined in § 1956(c)(3). *See United States v. Puig-Infante*, 19 F.3d 929, 938 (5th Cir. 1994).

There is some disagreement over which transaction is the actual "money laundering"

transaction at issue. Herrera asserts that only his alleged bribe payments constitute the money laundering transaction and that his acceptance of $3,000 from the de la Torres should not be considered the "laundering" transaction. Thus, he argues that the absence of evidence that any bribe payments were made is relevant to his money laundering conviction.

The statute does not make any distinction, however, between a party who *gives* the proceeds of an illegal activity and one who *receives* them. As we have explained, the question is whether the "transaction involved the *proceeds* of unlawful activity." *Puig-Infante*, 19 F.3d at 939.

In *Puig-Infante*, the defendant received money in exchange from the sale of marihuana. This appeared to be a transaction, but there was no indication that the money she received was the proceeds of unlawful activity. She then transported the money interstate by car. We held that while the transportation of money interstate involved the proceeds of an unlawful activity, the act of transporting was not a *transaction* for purposes of § 1956. *Id.*

As we will explain, the jury could infer that the transfer of $3,000 from Miguel to Herrera involved the proceeds of an unlawful activity. The only remaining question, then, is whether this purely cash transaction meets the definition of a transaction affecting interstate commerce.

Herrera avers that even if his acceptance of the $3,000 is the transaction at issue, the record is devoid of evidence establishing how the $3,000 cash payment he received affected interstate or foreign commerce. He maintains that the government has failed to meet its burden to show even a *de minimis* effect on interstate commerce. *See United States v. Westbrook*, 119 F.3d 1176 (5th Cir. 1997). He points out that in cases in which courts have affirmed money laundering convictions, the "laundering" transactions have at least been conducted via wire or the mails and that such money was then deposited into bank accounts. *See United States v. Alford*, 999 F.2d 818, 824 (5th Cir. 1993).

This court has emphasized the importance of the interstate or foreign commerce requirement of the financial transaction element. For instance, we refused to allow the government to meet its "financial transaction" burden merely by proving that cash was transported interstate by an automobile. *See Puig-Infante*, 19 F.3d at 937. We similarly refused to permit a jury to infer a "financial transaction" from evidence that cash was discovered in a defendant's home. *See United States v. Ramirez*, 954 F.2d 1035, 1039-40

9

(5th Cir. 1992).[6]

In neither of these cases, however, was the reviewing court bound by the plain error standard. Under plain error review, we ask only if there would be a manifest miscarriage of justice to allow the verdict to stand. Such a manifest injustice occurs only if "the record is devoid of evidence pointing to guilt, or . . . because the evidence on a key element of the offense was so tenuous that a conviction would be shocking." *Bailey*, 111 F.3d at 1235. Under the limited review allowed by the plain error standard, the jury did not commit plain error by inferring that the cash transaction between de la Torre and Herrera had a substantial effect on interstate commerce for purposes of the financial transaction element of § 1956.

(ii)

Herrera further argues that the government did not meet its burden of proving that he knew that the money he received came out of the proceeds of de la Torre's drug activities. The government did not ask Miguel to explain whether the money he used to pay Herrera resulted from drug proceeds or was generated through other means. We cannot say, however, that there is plain error in allowing the inference, from the voluminous evidence presented about the scale and scope of the de la Torre organization, that Miguel and Carmela generated most of their income from their drug trafficking business.

(iii)

Herrera charges that the absence of evidence about how he disposed of the money is fatal to the "intent to promote" or "intent to

---

[6] In a similar case, the Tenth Circuit refused to allow the government to establish an interstate commerce nexus based on a purely cash transfer. The court chided the government because it "did not introduce a shred of evidence showing the origin or destination of the specific $200 in Federal Reserve Notes that constituted the single alleged money laundering transaction. . . ." *United States v. Grey*, 56 F.3d 1219, 1225 (10th Cir. 1995).

conceal" element. He argues that there is no evidence that he used the money to promote the de la Torre's unlawful activity. Indeed, all of the agents conducting the de la Torre probe admitted that they had no evidence that Herrera did anything at all with the money he received. They do point, however, to Herrera's statements in his recorded conversations. Herrera characterizes his statements in these conversations as boasts and deceptions and argues that those statements alone are not sufficient to support his money laundering conviction.

The government submitted recorded conversations in which where Carmela told Miguel that Herrera had accepted money from their organization to bribe officers. Under plain error review, this evidence is sufficient to support a reasonable jury's inference that Herrera accepted the money with the intention of using it to promote the drug conspiracy through bribery.

3.

To demonstrate a *conspiracy* to commit money laundering, the government must prove (1) the existence of a conspiratorial agreement, (2) one co-conspirator knowingly commits an overt act by participating in a financial transaction, (3) that the financial transaction involves the proceeds of an unlawful activity, and (4) that the conspirator participating in the transaction had the intent to promote or further that unlawful activity. *United States v. Fierro*, 38 F.3d 761, 768 (5th Cir. 1994). Alternatively, a conspirator may be held responsible if he had the intent to conceal or disguise the nature, the location, source, ownership, or control of the proceeds of specified unlawful activity. § 1956(a).

Gurrusquietta does not challenge his substantive money laundering conviction. Instead, he argues that the government did not present sufficient evidence to support his conviction for *conspiring* to commit money laundering. Specifically, he asserts that the government never showed that he agreed to join in a money laundering conspiracy. At best, he claims that the government has only shown that he associated with individuals who

received money via wire transfers from Texas to Mexico. A person's close association with a conspirator is not enough to prove his intentional and knowing participation in the conspiracy. *United States v. Magee*, 821 F.2d 234, 238 (5th Cir. 1987).

Essentially, the government need only establish that Gurrusquietta agreed to be part of a conspiracy that would conduct financial transactions with the proceeds from illegal actions in furtherance of the conspiracy. The evidence establishes that Gurrusquietta had been a supplier to the de la Torre organization since 1994 and knew the organization used wire payments to agents in Mexico to purchase marihuana.

These payments over the wires meet the financial transaction element of § 1956, and the use of money from the distribution of drugs in Dallas satisfied the "illegal proceeds" element. The evidence also supported an inference that the money was used for the purpose of purchasing marihuana, thereby satisfying the "promoting in furtherance of the conspiracy" element.

Gurrusquietta's claim that he merely associated with the conspirators is misleading. The jury was entitled to infer from (1) his substantial involvement in the supply of marihuana to the organization and (2) his brother's agreement to send $15,000 to Mexico for marihuana purchases that he agreed to participate in the money laundering conspiracy.

## B.

Appellants allege that the district court made a number of prejudicial errors. Specifically, Robles attacks the admission of Carmela's testimony and the admission of telephone and pen register records authenticating the wiretapped conversations. Herrera alleges that the court erred by refusing (1) to allow witnesses to testify whether any officers had been bribed; (2) to allow Herrera's counsel to cross-examine federal agents; and (3) to sever Herrera's trial from that of the other conspirators. Herrera also invites us to review, on direct appeal, the effectiveness of

his trial counsel. Gurrusquietta raises a challenge to the admission of evidence seized during the April 8, 1997, traffic stop.

### 1.
#### a.

We review the admission of evidence for abuse of discretion. *See United States v. Coleman*, 997 F.2d 1101, 1104 (5th Cir. 1993). Even if such an abuse occurred, we will not reverse unless the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Lowery*, 135 F.3d 957, 959 (5th Cir. 1998).

Carmela de la Torre testified that Miguel told her that Robles worked for their organization. Specifically, she explained that Miguel would tell her that he needed to borrow the car to go with Robles to collect payments from drug sales. *Id.* Robles objected to this testimony as inadmissible hearsay.

Rule 801(d)(2)(E), FED. R. EVID., permits the admission of a "statement of a conspirator of a party during the course and in furtherance of the conspiracy." To introduce such statements, the government must demonstrate by a preponderance of the evidence that the speaker made the statement in the course of the conspiracy and in furtherance of it. *United States v. Narviz-Guerra*, 148 F.3d 530, 536 (5th Cir. 1998).

There is no doubt that Carmela, Miguel, and Robles were members of a conspiracy. Carmela served as a telephone contact point and would need to know who was participating in the organization. Additionally, she testified that Miguel told her about Robles's role in the context of explaining why he was borrowing the car. This testimony seems to satisfy the requirement that the statement be made in the furtherance of the conspiracy, because Miguel explained that he needed the car to go and collect money from drug sales. The court did not abuse its discretion in admitting this testimony under the rule 801(d)(2)(E) co-conspirator exception to

the hearsay rule.[7]

**b.**

Robles objects to the admission of "pen register" and wiretap orders from the Southwestern Bell Company ("SWB"), arguing that the government did not lay sufficient foundation to admit them under the business records exception to the hearsay rule. *See* FED. R. EVID. 803(6). The rule requires the government to lay foundation for business record evidence through the testimony of a witness who can attest to the procedures used to create and maintain the records within the business. *United States v. Hutson*, 821 F.2d 1015, 1020 (5th Cir. 1987). Robles charges that Mary Powell, a witness from the parent company ("SBC"), was a custodian who could certify that the records were correct.

Powell was an employee of SBC and worked in an office specializing in complying with "court orders." She testified that the records were created by an employee of SWB in the regular course of business and that she personally maintained many of the records in her office. Although she did not personally create the records used in evidence, her testimony confirmed that the procedures for maintaining the records submitted into evidence occurred in the regular course of business. This testimony is sufficient to qualify for the rule 803(6) exception to the hearsay rule. *See Hutson*, 821 F.2d at 1020.

**c.**

During her closing argument rebuttal, the prosecutor said, "Members of the jury, the five individuals that are before you today are involved in drug dealing in one way or another." According to Robles, this is a statement of personal belief regarding guilt that deeply prejudiced his case.

A prosecutor may not personally vouch for the credibility of witnesses, but he may argue reasonable inferences drawn from the evidence. *United States v. Munoz*, 150 F.3d 401, 414-15 (5th Cir. 1998). The prosecutor's statement here could be reasonably inferred from the evidence she presented and does not vouch for the credibility of any witness. Moreover, Robles does not show how this

---

[7] Moreover, even if the admission was in error, Robles has not shown that the statement substantially influenced the verdict. After all, the government introduced evidence of Robles's conversations with Miguel discussing various matters related to the drug-trafficking scheme, including (1) the status of payment collections; (2) the packaging of marihuana for sale; and (3) new locations for a stash house. This evidence would render the admission of Carmela's testimony harmless.

brief statement prejudices any of his substantial rights to a degree meriting reversal. The government offered substantial evidence, including recorded conversations in which Robles discussed drug-trafficking matters, to support his conviction. It is hard to see how this statement could have made a difference in the verdict.

### 2.
#### a.
Herrera sought to present witnesses who would testify that no police officers had been bribed as a result of his payments. He petitioned the court to allow the Dallas police chief or deputy chief to testify that no evidence of bribes had been found as a result of an internal investigation. The government objected, and the district court excluded these witnesses, ruling that their testimony was irrelevant and would not serve to impeach any government witnesses: "I don't believe that's relevant to any issue in the case other than you just want to establish nobody was bribed, and nobody said that anybody was bribed. I just don't see—that's not an element of anything that's been charged."

Herrera responds that the issue of whether he bribed anyone is relevant to the "financial transaction" and "furtherance of unlawful conduct" element of his money laundering charge. As we have stated, the "financial transaction" element at issue is not Herrera's alleged bribe payments. Rather, for purposes of the financial transaction element of his money laundering conviction, Herrera's *receipt* of the $3,000 in illegally generated proceeds from the de la Torre organization fulfills that element of the statute.

It is true, however, that whether Herrera actually paid the bribes is relevant to whether he "intended to promote unlawful conduct" for purposes of § 1956. Therefore, the district court erred when it ruled that whether any officer was bribed is "not an element of anything that's been charged."

We must still consider, however, whether the excluded testimony prejudiced Herrera's defense to such a degree requiring reversal.

The government did not have to prove that Herrera actually paid the bribes to the police officers. Rather, the statute simply requires the jury to find that Herrera accepted the $3,000 "with the *intent* to promote the carrying on of specified unlawful activity," i.e., the drug-trafficking conspiracy.

The government offered substantial evidence, in the form of recorded conversations between Miguel and Herrera, establishing that Herrera promised Miguel to use the $3,000 to pay off police officers. Given the strength of this evidence supporting the jury's finding that Herrera *intended* to pay bribes, we do not think the exclusion of witnesses testifying that no actual bribe payments were made could have substantially affected the jury's determination. Therefore, the court did not commit reversible error when it excluded Herrera's profferred witnesses.

#### b.
Herrera also sought to cross-examine federal agents about statements Herrera made at the time of arrest. In those statements, Herrera explained that he had made up his bribery story to get money from Miguel and that he had taken no action to pay bribes to police officers. The government filed a motion *in limine* to exclude this evidence as inadmissible hearsay.

The court asked Herrera to present an applicable exception to the hearsay rule that would allow Herrera to cross-examine the witnesses about his post-arrest statements. Herrera offered none. Without a valid exception to the hearsay rule, officers testifying about Herrera's statements to them would be testifying about an "out of court statement" offered for the truth of the matter asserted. Therefore, the court did not abuse its "wide latitude to impose reasonable limits on cross-examination" when it refused to admit hearsay evidence at trial.

#### c.
Herrera claims he should have been granted a severance. Rule 8(b), FED. R. CRIM. P., allows a court to join defendants in the same indictment "if they are alleged to have

participated in the same series of acts or transactions constituting an offense or offenses." To protect defendants, however, FED. R. CRIM. P. 14 authorizes a severance if it appears the defendant "is prejudiced by a joinder of offenses or of defendants in an indictment." A court should use rule 14 only "if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993). We review denial of a severance for abuse of discretion. *United States v. Pofahl*, 990 F.2d 1456, 1483 (5th Cir. 1993).

Herrera avers that he was highly prejudiced as a result of being tried with twenty co-defendants against whom the government provided wiretapped conversations depicting their involvement in the drug trafficking conspiracy. Essentially, Herrera argues that the cumulative effect of being tried with individuals who have been directly implicated in the drug conspiracy highly prejudiced his ability to highlight his own very different alleged role in the conspiracy.

Herrera's generalized claims of prejudice do not show reversible error. The *Zafiro* Court did state that "[w]hen many defendants are tried together in a complex case and they have markedly different degrees of culpability, [the] risk of prejudice is heightened," *Zafiro*, 506 U.S. at 539. The case cited as an example of this kind of prejudice involved a single trial of thirty-two defendants who themselves were part of *eight different conspiracies. See Kotteakos v. United States*, 328 U.S. 750 (1946).

Here, however, the government alleged only one conspiracy and only one organization of drug conspirators. Herrera dealt directly with the head of this organization and discussed matters related to protecting a single form of drug trafficking.

Additionally, the *Zafiro* Court emphasized that though courts may determine that separate trials are necessary, "less drastic measures, such as limiting instructions, often will suffice

to cure any risk of prejudice." *Zafiro*, 506 U.S. at 539 (citing *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)). The Court then found no abuse of discretion in a denial of severance, even where each defendant had accused the other defendant of the crime. The *Zafiro* Court concluded that with the proper instructions, the jury could give separate consideration to each individual defendant without prejudicing his co-defendant where the government offered evidence supporting guilt for all the defendants. *See id.* at 541.

In the instant case, the court gave a limiting instruction telling the jury to consider each defendant's guilt separately without imputing the guilt of one defendant to another. Following *Zafiro*, and in the absence of a more specific example of prejudice, we defer to the district court's sound discretion over motions for severance.[8]

d.

Herrera's counsel did not move for judgment of acquittal at the close of all the evidence. Therefore, he did not preserve Herrera's objections to the sufficiency of the evidence for his conspiracy, telephone use, and money laundering convictions. On the basis of this failure alone, Herrera's appellate counsel asks this court to find that Herrera received ineffective assistance of counsel pursuant to *Strickland v. Washington*, 466 U.S. 668 (1984). Following *Washington*, we will not reverse based on an ineffective assistance of counsel claim unless (1) the counsel's performance is deficient and (2) the errors are so prejudicial as to deprive the defendant of a fair trial. *Belyeu v. Scott*, 67 F.3d 535 (5th Cir. 1995).

---

[8] Herrera does point to *United States v. Cortinas*, 142 F.3d 242 (5th Cir. 1998), in which we reversed a denial of severance where the government had introduced, against co-defendants, "highly inflammatory evidence" of a shooting of a 14-year-old boy. *Id.* at 248. No such similarly "inflammatory" evidence was offered here that might have enraged the jury and motivated it to impute guilt to unrelated co-defendants.

"The general rule in this circuit is that a claim of ineffective assistance of counsel cannot be resolved on direct appeal when the claim has not been raised before the district court since no opportunity existed to develop the record on the merits of the allegations." *United States v. Higdon*, 832 F.2d 312, 313-14 (5th Cir. 1987). Review is undertaken only when the record allows a fair evaluation of the claim. *Id.*

Herrera claims that his trial counsel's failure to move for acquittal at the close of evidence is obvious from the record and adequately developed for review. Still, we have allowed these types of claims on direct appeal only in cases in which the trial attorney had been given a chance to respond to the allegations[9] or where government conduct was allegedly responsible for the ineffective assistance.[10] Herrera's trial counsel has not been given the opportunity to explain his alleged error, and there is no evidence to consider in the ineffective assistance of counsel record other than the mere failure to move for an acquittal. This is hardly a developed record. Accordingly, we dismiss the ineffective assistance claim without prejudice.

### 3.

Gurrusquietta challenges the failure to suppress evidence seized during the police search of his car on April 8, 1997. He was observed by federal agents picking up a gym bag from a car that had previously been at the de la Torre residence. The agents then followed him on the highway, contacted state police, and asked them to stop him for a traffic violation.

After stopping him pursuant to a traffic violation, the police asked for and received consent to search the car. Gurrusquietta now claims that because the state police officers would not have stopped him but for the federal

---

[9] *United States v. Phillips*, 664 F.2d 971, 1040-42 (Former 5th Cir. Dec. 1981).

[10] *United States v. Martinez-Perez*, 941 F.2d 295, 301-02 (5th Cir. 1991).

---

agent interventionSSand because the federal agents themselves did not have sufficient probable causeSSthe court should have suppressed all evidence from this search.

A warrantless arrest must be supported by probable cause. *United States v. Shugart*, 117 F.3d 838, 846 (5th Cir.), *cert. denied*, 118 S. Ct. 433 (1997). Probable cause exists when the totality of facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense. *Id.* Because we find that the challenged search was consented to after a legitimate traffic stop, we do not consider whether probable cause existed to sustain a warrantless search.

The police testified that they stopped Gurrusquietta's vehicle because it was following a vehicle too closely, then swerved and almost hit a police car. The government claims that, having been lawfully stopped, Gurrusquietta consented to the search, thereby obviating the probable cause requirement.

Gurrusquietta does not contest that he was stopped pursuant to a legitimate traffic stop or that he consented to the search. Rather, he contends that probable cause was still necessary, because the state police would have never stopped him were it not for the suspicions of the federal agents. In other words, because the traffic stop was motivated by federal agents' suspicions of a drug transaction, the stop itself must be supported by probable cause to pass muster under the Fourth Amendment.

Unfortunately for Gurrusquietta, we have upheld a search conducted pursuant to a traffic stop motivated by suspicions but not supported by probable cause. Because we review only the objective reasonableness of a search, we will not consider the subjective motives of the officer conducting the search. *See United States v. Castro*, 166 F.3d 728, 734 (5th Cir. 1998) (en banc).

In *Castro*, we upheld a search conducted

after a legitimate traffic stop, even though the government admitted that the stop had been motivated by suspicions of drug trafficking. Therefore, this court squarely rejected the view advanced by Gurrusquietta here (and in the *Castro* panel opinion) that because the traffic stop was a "ruse," any subsequent search had to be supported by probable cause. *Castro*, 166 F.3d at 734.

For this reason, the district court did not err when it refused to suppress evidence seized during the April 8 search of Gurrusquietta's car. The traffic stop was legitimate, and the subsequent search was conducted only after the officers received the consent of the passengers. No probable cause was needed to support this search.

## D.

We review the application of sentencing guidelines to factual findings and the factual findings themselves for clear error. In making findings of fact for sentencing purposes, a court need only be convinced by a preponderance of evidence. *Shugart*, 117 F.3d 838, 848 (5th Cir.), *cert. denied*, 118 S. Ct. 433 (1997).

### 1.

Robles's sentence was enhanced two levels pursuant to U.S.S.G. § 2D1.1(b)(1) for possessing a dangerous weapon. Robles argues that there is no evidence that he possessed any weapon at all, much less one that was connected to the drug conspiracy. We review this frontal assault on factual findings for clear error.

The district court relied primarily on recorded conversations in which Robles recounted stories about using a firearm during drug transactions. These conversations also revealed Miguel de la Torre's instructing Robles to purchase a firearm for use during drug transactions. The court also enhanced Robles's sentence because an empty gun box with ammunition was found at his home.

Robles responds that he was only bragging about using a gun during the recorded conversations and that there is no evidence that he actually used a gun as part of the drug conspiracy. Under the clear error standard of review, though, the court was entitled to disbelieve Robles's "I was just bragging" defense. We affirm the two-level gun enhancement.

### 2.
#### a.

According to U.S.S.G. § 1B1.3, a defendant is liable for the amount of drugs reasonably foreseeable to him during the life of the conspiracy. The court accepted the PSR's calculation that Robles should be attributed 1,000 pounds of marihuana.

The PSR made this calculation in an unusual manner. First, it relied on Miguel de la Torre's testimony that his organization moved between 20,000 to 25,000 pounds of marihuana during a 78-week period. More specifically, the PSR found that Miguel had sold and distributed about 1,000 pounds of marihuana between April 14 and May 9, 1997, thus averaging about 250 kilograms a week. Because the PSR found that Robles worked closely with Miguel over the last two months of the conspiracy, the PSR found that Robles should be attributed at least 1,000 pounds for this period, because all the drugs moved by the organization were reasonably foreseeable to him.

Robles replies that it is improper to average the marihuana moved over the 78-week period to calculate the amount attributable during the last two months, because Miguel made far fewer transactions during that period. In fact, Robles claims there is no evidence that any marihuana transactions occurred during the period cited by the PSR.

According to the PSR, however, the final amount attributed to Robles was based on "further investigation by case agents" rather than on simple averaging. In its initial recommendation, the PSR noted that it had calculated the amounts attributable to Robles based on "wire communications, video and physical surveillance, debriefings with co-defendants, arrest and seizure of money and wire transfer records." We infer that the PSR's reference to "further investigation" in the addendum means that the PSR's 1,000-pound calculation is based on more than mere averaging. Therefore, the court did not commit clear error when it adopted this section of the PSR.

b.

Gurrusquietta was held responsible for more than 1,000 kilograms of marihuana, subjecting him to an enhanced sentence requiring a 240-month mandatory minimum. The evidence at trial and in the PSR, however, plainly stated Gurrusquietta was only responsible for 668.15 kilograms.

The government concedes this is clear error and requests a remand for resentencing. We therefore vacate Gurrusquietta's sentence and remand for resentencing under a guideline range consistent with the amounts attributed to him.

The judgments of conviction and sentence are AFFIRMED, except that Gurrusquietta's sentence is VACATED and REMANDED for resentencing.

17